## 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### KATE E. WHITE v. PACIFIC MUTUAL LIFE INSURANCE COMPANY, ET AL.

### AND

### MILTON E. MARCUSE v. KATE E. WHITE IN HER OWN RIGHT AND AS, ETC.

#### May 24, 1928.

1. WITNESSES—*Corroboration—Transactions with Deceased Persons— Section 6209 of the Code of 1919.*—In order to establish a contract with a deceased person, under section 6209 of the Code of 1919, there must be disinterested testimony pointing with reasonable certainty to, and corroboration of, the material evidence given by an interested witness or witnesses.

2. WITNESSES—*Corroboration—Transactions with Deceased Persons—Section 6209 of the Code of 1919—What Constitutes Corroborative Evidence.*— Corroborative evidence, under section 6209 of the Code of 1919, is such evidence as tends in some degree, of its own strength and independence, to support some essential allegation or issue raised by the pleadings testified to by the witness, whose evidence is sought to be corroborated, which allegation if unsupported would be fatal to the case.

3. WITNESSES—*Transactions with Deceased Persons—Corroboration—Section of the Code of 1919—Purposes for which Life Insurance Policy were Assigned—Case at Bar.*—In the intsant case the holder of a life insurance policy had assigned it as collateral security. The policy was for $5,000.00. The assignor was indebted to the assignee for $2,100.00 for accommodation endorsements by the assignee, and in addition the assignor was indebted to a corporation, of which the assignee was one of the principal owners, for $4,400.00. It was claimed by the assignee that by a verbal agreement the policy was to be held by the assignee as security for both debts. As the assignor was dead, it was essential, under section 6209 of the Code of 1919, that the testimony of the assignee as to this verbal agreement should be corroborated. The evidence of the only corroborating

witness was most inconclusive and unsatisfactory. He could not testify positively that he was present when the alleged agreement was made and merely assumed that the policy was assigned as collateral security for both debts.

*Held:* That this corroborative evidence fell far short of pointing to and supporting with reasonable certainty the testimony introduced by the assignee to establish the agreement.

4. Life Insurance—*Assignment of Policy as Collateral Security—What Debts Policy was Assigned to Secure—Case at Bar.*—In the instant case a policy of life insurance was assigned by the insured as collateral security. Insured was indebted to the assignee for the sum of $2,100.00 for accommodation endorsements of the assignee. In addition the assignor was indebted to a corporation, of which the assignee was one of the principal owners, for $4,400.00. Assignor asked the assignee to write him to the effect that should the policy become collectable the assignee would see that the wife of the assignor got the remainder of the policy "after the notes you have loaned me are paid." This the assignee did.

*Held:* That from this correspondence it was quite clear that both parties thought the assignor had an equity in the policy at the time the letters were written and that had the parties at that time had in mind the debt of $4,400.00 due to the corporation they would have known that there was no equity for the assignor's wife.

5. Life Insurance—*Assignment of Policy as Collateral Security—Trust Created in Policy by Correspondence between Assignor and Assignee.*—The holder of a life insurance policy assigned it as collateral security. The assignor wrote to the assignee asking him to write the assignor stating frankly that should the policy become collectable that the assignee would see that the wife of the assignor got "the remainder of the policy after notes you have loaned are paid." To which the assignee replied that he wanted the assignor and his wife "to know that the policy you are carrying for my benefit is to cover indebtedness incurred for you and by you and any balance that arises over and above those amounts will be paid to" your wife after all the notes assignee had loaned to assignor were paid.

*Held:* That this correspondence between the assignor and assignee created an express trust in the balance of the policy in favor of the wife of assignor.

6. Fraudulent and Voluntary Conveyances—*Whether Payment of Life Insurance Premium Constitutes a Voluntary Conveyance—Rights of Creditors.*—In Virginia, under the statute of voluntary conveyances, section 5185 of the Code of 1919, payment of premiums by an insolvent debtor on a policy of insurance for the benefit of another, out of his earnings or otherwise, is manifestly a "voluntary transfer of property without providing for existing debts" and is within the

purview of the statute; and existing creditors of the insured may subject the proceeds of the policy after death of the insured to the extent of the premiums so diverted (but no further) and within the period permitted by the statute of limitations.

7. Fraudulent and Voluntary Conveyances—*Whether Payment of Life Insurance Premium Constitutes a Voluntary Conveyance—Rights of Creditors.*—The obvious intent of the statute, section 5185 of the Code of 1919, is to invalidate as against existing claims of creditors every gift or voluntary assignment of the debtor's property without regard to its object or form. To the extent the means of the insured are withdrawn from creditors and applied to the payment of premiums on life insurance policies for the benefit of others the payments are void as against creditors, and they are entitled to have the sum so paid applied to the discharge of their claims out of the proceeds of the policies.

8. Fraudulent and Voluntary Conveyances—*Whether Payment of Life Insurance Premiums Constitutes a Voluntary Conveyance—Rights of Creditors—Cash Surrender Value of Policy.*—While the cash surrender value of a policy of insurance may be reached by creditors and applied by proper process to the payment of obligations, where it has been assigned in contravention of section 5185 of the Code of 1919, other than this, the interest of the assured cannot ordinarily be subjects.

9. Executions—*What Subject to Execution—Interest of Assured in a Policy on His Life.*—The interest of an assured in a policy on his life which has no present market value, but is dependent for its continued existence on voluntary payments to be made in the future by the assured, is not such an interest or estate as can be reached by a *fieri facias.* It is immaterial that the assured, in a given contingency, is allowed to surrender his policy and take in lieu thereof a paid-up policy for a different amount.

10. Executions—*What Subject to Execution—Debt Payable in the Future—Debt which Rests upon a Contingency.*—A debt which has a present existence, although payable in the future, may be subjected to the lien of a *fieri facias,* but not a debt which rests upon a contingency which may or may not happen and over which the court has no control.

11. Fraudulent and Voluntary Conveyances—*Whether Payment of Life Insurance Premium Constitutes a Voluntary Conveyance—Rights of Creditors—Case at Bar.*—On October 15, 1925, a debtor had a policy on his life which had a cash surrender value of $1,085.00 and to that extent was possessed of an estate to which his creditors had a right to resort in preference to his wife, the beneficiary. But up to July 1925, when the last premium was paid, there was no evidence that the debtor was insolvent. If the last annual premium of $316.50 was

paid after the debtor became insolvent, then this amount contrib-
uted its part ($132.72) in making up the cash surrender value of
$1,085.00, and there is an apparent loss to the creditors of $184.00,
which was consumed in carrying the risk for twelve months. Adding
this to the cash value of the policy, there was $1,269.00 applicable
to the payment of the debtor's debts. The debtor assigned, as he
had a right to do, $2,100.00 of the policy to secure an indebtedness
to one M., to the exclusion of other creditors.

*Held:* That by this assignment $2,100.00 instead of $1,269.00 was ap-
plied to the debtor's debts and, therefore, that part of decedent's
estate to which creditors had a right to resort, and considerably
more, had been so applied.

Appeal from a decree of the Circuit Court of Buck-
ingham county. Decree for defendant. Complainant
appeals.

*Decree modified and affirmed.*

The opinion states the case.

*A. B. Dickinson*, for the complainant in the first
case.

*Watkins & Brock* and *Alfred J. Kirsh*, for the appel-
lees in the first case.

*Alfred J. Kirsh* and *Wendenburg & Haddon*, for the
complainant in the second case.

*A. B. Dickinson* and *Watkins & Brock*, for the appel-
lees in the second case.

MCLEMORE, J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court
of Buckingham county in which the rights of the re-
spective litigants to the proceeds of an insurance policy

on the life of H. M. White were ascertained and decreed.

Petitions for appeals were filed by Kate E. White, widow of H. M. White, and by M. E. Marcuse, a creditor of the decedent, and were allowed in each case. As a discussion of the question raised in one of the petitions will necessarily involve those raised in the other, they will be considered and disposed of in one opinion.

On July 11, 1917, H. M. White applied for and there was issued to him by Pacific Mutual Life Insurance Company a policy for $5,000.00, payable to his estate at his death. In the policy was a clause giving the insured the right to "designate a new beneficiary, reserving the right of revocation, by filing written notice thereof at the home office of the company, accompanied by this policy for suitable endorsement thereon."

M. E. Marcuse, who had been endorsing paper for White, or issuing his own notes for White's accommodation, to the extent of $2,100.00, as of May 3, 1919, had White assign to him the $5,000.00 policy heretofore referred to, said assignment being approved by the company, and the policy retained by Marcuse until the death of the assured, October 15, 1925.

On September 26, 1925, White addressed to Marcuse the following letter:

"DILLWYN, VA., September 26, 1925.

"MR. M. E. MARCUSE, Pres.

"Bedford Pulp and Paper Co., Inc.

"Big Island, Va.

"DEAR MR. MARCUSE:

"I have received from Bob the insurance policy, and the loan value on it is $1,085.00. This I am going to apply for, but the policy has to go to California and

back and I do not know when it will get here. *Won't* you please write a letter and state very frankly that should this policy become collectable that you will see that Mrs. White gets the remainder of the policy after notes you have loaned me are paid.

"Things are in bad shape just at present, and I certainly wish it were possible to allow me to go to shipping pine wood again. I am not at all well and can't help from being despondent when things go against me like they have been going against me most of this year.

"Yours very truly,
"(Signed) H. M. White."

To which Marcuse replied as follows:

"Big Island, Va., September 27, 1925.
"Mr. H. M. White,
"Dillwyn, Virginia.
"Dear Mr. White:

"I have yours of the 26th and am sorry that you seem to be so depressed in spirits. Of course, I am from the experience through which I have just passed.

"I want you and Mrs. White to know that the policy you are carrying for my benefit is to cover indebtedness incurred for you and by you, and any balance that arises over and above those amounts will be paid to Mrs. White after all notes I have loaned to you are paid.

"Of course, I would have done that anyway without any suggestion on your part. I trust, however, that day of collection on the policy will be long deferred.

"With very kind regards, I remain,
"Sincerely yours,
"(Signed) Milton E. Marcuse."

At the bottom of the letter there is appended in the handwriting of Mr. White (in pencil): "After Mr. Marcuse personal notes loaned me are paid there

should be fully $2,500.00 to go to Mrs. White." This letter in some unexplained manner was in possession of Mr. Marcuse and was by him introduced in evidence as a part of his deposition.

The Marcuse brothers were the principal owners of two corporations, Bedford Pulp and Paper Company, Incorporated, and Bedford Timber and Land Corporation, with both of which corporations decedent had been dealing for sometime, and at his death appears to have been indebted to the pulp company in the sum of $58,000.00, and to the timber company in the sum of $4,400.00, which latter amount had its origin in notes of the company loaned by M. E. Marcuse, president, to White as accommodation paper.

The bill in this cause was filed by Kate E. White, widow, setting out in substance the facts above outlined, and asking the chancellor to decree to her the proceeds from the policy of insurance after paying to Marcuse the $2,100.00 due him, and to secure which the policy was by him being held.

The same Kate E. White, administratrix of H. M. White, deceased, filed her answer denying the conclusions of the bill, and asserting her right as administratrix to receive and distribute among the creditors the amount remaining after the payment of the $2,-100.00 for which the policy was pledged.

The answer of M. E. Marcuse, in addition to the admitted debt due him of $2,100.00, claims the remainder of the policy under the original assignment, supported by a verbal agreement that the debt due the timber company of $4,400.00 should be protected in so far as the proceeds from the policy were sufficient for that purpose, i. e., that he was holding the same as security for the amount due him personally and the

amount due Bedford Timber and Land Corporation as well.

There were at the time of his death other policies on the life of White, which were held by Bedford Pulp and Paper Company, upon which as much as $15,541.00 had been collected at the time this case was heard in the circuit court.

At the time of White's death, October 15, 1925, the $5,000.00 policy was held by Marcuse, and upon it was the following endorsement:

"On written request of the insured hereunder, the beneficiary in this policy is hereby changed to Milton E. Marcuse, should he survive said insured, otherwise to the insured executors, administrators or assigns.

"It is understood and agreed that the right to change the beneficiary at any time hereafter, in the matter and form provided in the policy, is reserved by the insured.

"Dated May 3, 1919.

"The Pacific Mutual Life Insurance Company of California.

                    "George I. Cochran, President."

Upon the hearing of the cause on the merits, the learned chancellor entered the following decree from which these appeals have been granted:

"This day this cause came on by consent of all parties by counsel to be heard, in vacation, on the 15th day of November, 1926, on the bill, on the answer of Kate E. White, administratrix of H. M. White, on the answer of Milton E. Marcuse, filed this day by leave of court, and on the depositions of witnesses, and was argued by counsel.

"On consideration whereof and the court being of opinion that the policy of $5,000.00 on the life of H. M. White, in the Pacific Mutual Life Insurance

Company, was assigned to Milton E. Marcuse as collateral security for the personal indebtedness of the said White to the said Marcuse, amounting to $2,100.00, and that the said Marcuse is entitled to that amount out of the proceeds, but that such assignment was only as collateral security for such personal indebtedness and he has no right to hold the proceeds of said policy for any other purpose, or to any other extent, and doth so decide, adjudge, order and decree.

"And the court is further of opinion that the correspondence between Milton E. Marcuse and H. M. White creates an express trust as claimed in the bill and would constitute a valid equitable assignment of the property in question, if such a proceeding were not in contravention of the statutes against fraudulent and voluntary transfers. But the court is further of the opinion that such transfer was voluntary and void as to existing creditors under the statute, and doth so decide, adjudge, order and decree.

"And the court doth further adjudge, order and decree that the balance of the proceeds of said insurance policy is an asset of the estate of H. M. White, deceased, and doth adjudge, order and decree that Milton E. Marcuse to pay Kate M. White, administratrix, or to Watkins and Brock, her attorneys, the sum of $2,878.61 in the hands of the said Milton E. Marcuse in excess of the $2,100.00 to which he is entitled, and that the Pacific Mutual Life Insurance Company do pay the balance of the proceeds of the said policy to Kate E. White, administratrix of H. M. White, or to Watkins and Brock, her attorneys.

"And the court doth adjudge, order and decree that Kate E. White, administratrix of H. M. White, do recover her costs in this behalf expended."

The petition of M. E. Marcuse brings up for review

that portion of the decree which decides that he can only apply so much of the proceeds of the policy as was required to pay off the direct obligations of the decedent to petitioner, namely $2,100.00. The effect of this decree is to reject the contention of Marcuse that he was to hold the policy as security for any debt due by White to Bedford Timber and Land Corporation, and this is, therefore, one of the vital issues in the case, for if the court erred in this particular then the other questions presented by the pleadings would be academic, as all of the money arising from the policy after paying the $2,100.00, would be consumed in reducing the indebtedness of $4,400.00, admittedly due to the said company.

The purpose for which this policy was assigned thus becomes an impartial enquiry. That it was placed in the hands of Marcuse as security for a debt or debts, is conceded. As to any verbal agreement between the parties at the time of its assignment or afterward, we have the testimony of M. E. Marcuse, I. J. Marcuse and Robert E. Winfree, the auditor for the Marcuse interest. White, the other party to the contract attempted to be set up, is dead.

Section 6209 of the Virginia Code, reads:

"In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; and in any such action or suit, if such adverse party testifies, all entries, memordanda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence."

[1] In order to establish the contract contended for there must be disinterested testimony pointing with reasonable certainty to, and corroboration of, the material evidence given by the interested witness or witnesses.

As was said by Burks, J., in *Burton* v. *Mason*, 142 Va. 500, 129 S. E. 356:

[2] "However it may be stated as an abstract rule, that corroborative evidence, under this section, is such evidence as tends in some degree, of its own strength and independency, to support some essential allegation or issue raised by the pleadings testified to by the witness, whose evidence is sought to be corroborated, which allegation if unsupported would be fatal to the case."

The evidence of the corroborating witness, Winfree, is most inconclusive and unsatisfactory: We quote from his testimony:

"Q. You said you had this policy in your possession?

"A. Yes.

"Q. From whom did you get it?

"A. Mr. Marcuse.

"Q. You were not present when Mr. White turned the policy over to Mr. Marcuse?

"A. I may or may not have been; I was present at four out of five conferences between Mr. White and Mr. Marcuse in the discussion of their financial arrangements, and at the time the policy was delivered to me I may have been in the office and taken it from Mr. Marcuse's hands in Mr. White's presence. I am not sure of that because there were so many conferences that it would be hard to place any distinct one as to what absolutely happened on any one occasion.

"Q. So you have no independent recollection at all of what Mr. White said to Mr. Marcuse at the time of

the delivery by Mr. White of this policy of Mr. Marcuse?

"A. I have this recollection, that Mr. Marcus gave me the policy to keep for him and Mr. White stated to me the same day, possibly not in the conference, that this policy was collateral for his indebtness.

"Q. To Mr. Marcuse?

"A. Yes.

"Q. That did not include any indebtness of Mr. White's to the Bedford Timber and Land Corporation?

"A. I assume that it did because my understanding was that Mr. Marcuse in these transactions was liable for the notes of the corporation which he loaned to Mr. White."

[3] This we think falls short of pointing to and supporting with reasonable certainty the testimony introduced by the claimants, and to establish which is essential, if their contention is to prevail.

[4] In reaching this conclusion we have left out of consideration, for the moment, the letter of September 26, 1925, from White to Marcuse and the latter's reply of September 27th heretofore referred to in this opinion. From this correspondence it seems to us quite clear that both parties thought White had an equity in the policy at the time they were written, and it is equally as certain that had the parties at the time had in mind the debt of $4,400.00 due to Bedford Timber and Land Corporation, they would have known there was no equity for White's wife, and the letters would have been idle jestures. We think, therefore, that the decree as it dealt with this phase of the case was without error.

[5] The decree appealed from was also correct in holding that the "correspondence between Milton E. Marcuse and H. M. White creates an express trust as claimed

in the bill," *Watson* v. *Bruner*, 128 Va. 600, 105 S. E 97; 26 R. G. L. page 1194, but we are of the opinion the learned chancellor is in error in decreeing, under the facts here presented, that the surplus after paying to Marcus the $2,100.00 to which he was clearly entitled, should be paid to the administratrix of H. M. White, for distribution among his general creditors.

This was an ordinary life policy, with premiums payable annually so long as the assured lived. He could discontinue payments at any time, and his interest in the policy would thereby cease, but with this proviso, that after certain annual payments had been made, he could take a paid up policy payable at his death, or could surrender the policy for a stipulated cash consideration.

At the time of the equitable assignment made for the benefit of his wife—September 26, 1925—the policy had a paidup insurance value of $1,520.00 for which White had paid in premiums $2,572.35, and its cash surrender value was $1,085.00. The policy was issued July 11, 1917.

The record does not inform us of the time when White became insolvent, further than an admission that this condition did exist in September, 1925, and the equitable assignment of the policy for the benefit of the wife was voluntary as to existing creditors and is void under section 5185 of the Code, provided it is such property as is covered by the provisions of said section.

This is the most difficult question presented by the pleadings of the cause, and we believe the precise question has not before been passed upon by the Supreme Court of Appeals.

Mr. Lile, in his Notes on Equity Jurisprudence (1921), pages 156 and 157, under the heading: "Life

Insurance—Payment of premiums by |insolvent debtor," says:

[6] "The doctrine of the text that an insolvent debtor may insure his life for the benefit of his wife or family, and pay the premiums out of his earnings or otherwise, without giving just cause of complaint to his existing creditors, while sustained by respectable authority, seems to have its foundation rather in judicial sympathy for the wife and children than in any sound principle of equity. The payment of such premiums, while insolvent, is manifestly a *voluntary transfer of property without providing for existing debts*— and seems clearly within the terms of the statute. We have already seen that if the insolvent settles *houses and lands*, or *money*, or *securities*, directly upon his wife, when not bound thereto by antenuptial contract, equity will let in existing creditors upon the property. No difference is perceived where he settles an *insurance policy* upon her, and devotes money which should go to his creditors to the payment of premiums on the policy.

"In Virginia it is settled that under our statute of voluntary conveyances, premiums thus paid on a policy of insurance for the benefit of another, are within the purview of the statute; and that existing creditors of the insured may subject the proceeds of the policy after death of the insured, *to the extent of the premiums so diverted* and within the period permitted by the statute of limitations (five years in Virginia, in the case of a purely voluntary conveyance)."

*Stigler* v. *Stigler*, 77 Va. 163, is authority for the proposition stated by Mr. Lile. Lewis, P., speaking for the court says:

[7] "In this case each of the policies was intended as a gift to accrue to the beneficiaries therein named.

When the premiums on them were paid, the insured was indebted. The obvious intent of the statute is to invalidate as against existing claims of creditors every gift or voluntary assignment of the debtor's property, without regard to its object or the form in which it is made. It is plain, therefore, that to the extent the means of the insured were withdrawn from creditors and applied to the payment of premiums on the policies in question, the payments were void as against creditors, and that they were entitled to have the sums so paid applied to the discharge of their claims, out of the proceeds of the policies."

From these authorities the conclusion is irresistible that creditors in the instant case have no rights as respects the proceeds from the policy beyond the premiums withdrawn from decedent's estate in his life time (and after he became insolvent) in order to purchase the insurance. Beyond this, decedent has done his creditors no wrong, and his assets have not been diverted to their hurt. His estate must pay back the premiums, if at all, because when he paid the premiums he was using his creditors' money; money which they had the right to demand should be paid on their debts. As to the difference between the premiums paid after insolvency and the face of the policy he was gambling for the benefit of his family with the probabilities of death, and whatever the result, creditors have no just grounds of complaint.

[8] While the *cash surrender value* of a policy of insurance may be reached by creditors and applied by proper process to the payment of obligations, where it has been assigned in contravention of section 5185 of the Code, other than this, the interest of the assured cannot ordinarily be subjected, the reasons for which are well stated in *Boisseau* v. *Bass*, 100 Va. 207,

(syllabus), 40 S. E. 647, 57 L. R. A. 380, 93 Am. St. Rep. 956:

[9, 10] "The interest of an assured in a policy on his life which has no present market value, but is dependent for its continued existence on voluntary payments to be made in the future by the assured, is not such an interest or estate as can be reached by a *fieri facias.* It is immaterial that the assured, in a given contingency, is allowed to surrender his policy and take in lieu thereof a paid-up policy for a different amount. This would involve the making of a new contract, and, ordinarily a creditor can only subject the interest of his debtor in existing contracts. A debt which has a present existence, although payable in the future, may be subjected to the lien of a *fieri facias,* but not a debt which rests upon a contingency which may or may not happen and over which the court has no control. *Combs* v. *Hunt,* 140 Va. 627, 125 S. E. 661, 37 A. L. R. 621; *Fentress* v. *Rutledge,* 140 Va. 685, 125 S. E. 668.

So much for the principles of the law involved in the pleadings of the cause. We come now to the application of the principles to the facts as shown by the record.

[11] On October 15, 1925, this policy had a cash surrender value of $1,085.00, and to that extent White was possessed of an estate, to which his creditors had the right to resort, in preference to his wife. This sum was created by the withdrawal from his estate of annual premiums spread over the years from July, 1917, to July, 1925, but up to this last premium we have no evidence that White was insolvent, and, therefore, cannot say that the costs of carrying the insurance was at the expense of the creditors. If we assume that the last annual premium of $316.50 was paid after White became insolvent, then this amount contributed its

part ($132.72) in making up the cash surrender value of $1,085.00. By this process there is apparently a loss to the creditors of the difference between $316.00 and $132.00 or $184.00 which is consumed in carrying the risk for twelve months. Adding this to the cash value of the policy and we have $1,085.00, plus $184.00, or $1,269.00 as the utmost amount applicable. to the payment of decedent's debts.

White offended against no law of this State when he used this policy to secure an indebtedness to Marcuse to the exclusion of other creditors. He had in it at the time of the assignment for the benefit of his wife $1,269.00 which, we have seen, should be applied toward the payment of his debts. By the Marcuse assignment $2,100.00 instead of $1,269.00 was so applied, and, therefore, that part of decedent's estate to which creditors had a right to resort, and considerably more, has been so applied.

The court is therefore of the opinion that Milton E. Marcuse after deducting $2,100.00 and such interest as may be due thereon, should pay over to the widow of H. M. White the balance in his hands collected on account of said policy, and that the Pacific Mutual Life Insurance Company should pay to her the balance due on said policy remaining in its hands, and that she should recover her costs by her expended.

*Decree modified and affirmed.*